# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

EDWARD FRIETZE and
JOSIE FRIETZE,

       Plaintiffs,

And

CITICORP MORTGAGE, INC., d/b/a
CITIMORTGAGE INC., and/or
CITIMORTGAGE, INC.,

A Nominal Party and Party of Interest,

      v.                                                             No.CV 12-840 WJ/CG

ALLSTATE INSURANCE COMPANY
An Arizona Corporation,

      Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## and
## GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S DUTY TO INDEMNIFY

THIS MATTER comes before the Court upon Plaintiffs' Partial Motion for Summary Judgment on Defendant's Duty to Indemnify, filed May 31, 2013 (**Doc. 62**); and Defendant's Motion for Summary Judgment, filed June 7, 2013 (**Doc. 65**). Having reviewed the parties' briefs and applicable law, the Court finds that Defendant's motion for summary judgment shall be denied, and that Plaintiffs' motion for summary judgment shall be granted with regard to Plaintiffs' breach of contract claim in Count I of the Amended Complaint.

**BACKGROUND**

Plaintiffs in this case allege that Defendant Allstate Insurance Company ("Allstate") failed to provide property insurance coverage for a sewer plumbing system backup into their rental property causing financial damage, lost business and foreclosure of the property. The complaint was filed in the County of Dona Ana, Third Judicial District, State of New Mexico, on May 16, 2012, and was removed by Defendants to this court on August 2, 2012 on the basis of diversity of citizenship under 28 U.S.C. §1332.

Plaintiffs allege that Allstate breached its contract and acted in bad faith by refusing to pay for Plaintiffs' property damage arising out of the sewer backup by unreasonably denying coverage based on a vandalism endorsement in their insurance policy, and then refusing to investigate the cause of the loss. The Amended Complaint ("complaint," Doc. 58) alleges Breach of contract (Count I); Violation of Unfair Insurance Practices Act (Count II); and Insurance Bad Faith (Count III). Allstate contends that its decision that there was no coverage and that investigation was reasonable and fair under the circumstances.

**I.  Undisputed Facts[1]**

Both motions for summary judgment address the same two central issues: whether the cause of the sewer backup was vandalism (in which case the damage would be covered under the vandalism endorsement), and if so, whether vandalism was the "predominant cause" of the sewer backup. For this reason, the Court views the undisputed facts as those presented collectively in both motions, and sets forth the disputed issues separately according to both motions.

---

[1] The following facts are supported by evidence or testimony presented in the parties' exhibits. These exhibits include portions of the Policy at issue. Parties have submitted a total of six briefs, three pleadings for each party's motion, including exhibits which by stipulation exceed the page limitations set by the local rules. However, the material and relevant facts can be distilled to a number which is far fewer than the number presented by the parties. The Court has considered all responsive facts presented by the parties. "Disputes" of fact not mentioned in the factual narrative were considered by the Court to be either irrelevant, immaterial or non-responsive.

A.   The Policy

The Frietzes ("Plaintiffs") were "named insureds" under the Allstate landlord's Package Policy ("Policy").  The Policy excluded coverage for "[w]ater or any other substance that backs up through sewers or drains.  ("Exclusion 2").   The Policy initially excluded coverage for vandalism, under "Exclusion 20," but Plaintiffs paid an additional premium for a Policy Endorsement which covered vandalism (AP266, replacing Exclusion 20) and provides coverage for the following:

> 20. Vandalism, or loss caused by fire resulting from vandalism, if your dwelling is vacant or unoccupied for more than 90 consecutive days immediately prior to the vandalism.[2]

Doc. 62, Ex. 1 ("Policy"), Form AP266, ALL040.  The Policy also contained Exclusion 24 that handles concurrent, or two or more causes of loss to covered property, which provides:

> 24. We do not cover loss to covered property described in Coverage A - - Dwelling Protection or  Coverage B - - Other Structures Protection when: a) There are two or more causes of loss to the covered property; and b) The **predominant cause**(s) of loss is (are) excluded under Losses We Do Not Cover Under Coverages A and B.

Policy, Ex. "1", ALL021, p. 9 (emphasis added).   The word "predominant" is not defined in the Policy.  "Vandalism" is defined in the Policy as "willful or malicious conduct resulting in damage or destruction of property." Ex. 1, ALL015.

B.   Facts Regarding Occurrence and Claims

Between July 3, 2008 and July 11, 2008, the City of Las Cruces' ("City") sewer backed up into the insured premises of the Frietze rental property located 2065 O'Donnell, Las Cruces, New Mexico 88001, which provided rental housing within the New Mexico State University area. The Frietzes discovered the backup when they went to their rental property on July 11, 2008.  On July 11, 2008, Plaintiffs made a claim with Allstate which informed their insured the

---

[2]   The applicable time period has no relevance to these discussions.

3

loss was not covered and instructed them to file a claim with the City. Plaintiffs then filed claims for the loss with both the City and Allstate. Plaintiffs asked Allstate for an investigation and documentation of the damage to their property.

On July 16, 2008, Allstate hired Roadrunner Claims to inspect the Frietze property for "damage only" (or "scope only") and did not perform an investigation to determine what really caused the sewer water backup. The Roadrunner damage only report was received July 25, 2008. On July 22, 2008, prior to receipt of the investigation report, Allstate sent the Plaintiffs a letter denying coverage, on the basis that the cause of loss was a sewer backup from the City sewer. Doc. 62, Ex. 8.

The City initially believed that it was responsible for the costs of remediation for the sewer backup. However, on July 13, 2008, Las Cruces utility workers discovered a fire extinguisher in the sewer line. An investigation was conducted by Las Cruces Utility Wastewater Collection Supervisor, Glenn Ford (Director of the Utilities Department of the City of Las Cruces), Dr. Jorge Garcia (Chief Utilities Engineer), and Jared Abrams, the City Attorney assigned to the case. Mr. Ford's utility crew cleaned out the sewer line, using a rod to unclog the grease and paper accumulation. The fire extinguisher was dislodged and removed from the sewer pipe a little over a day after the debris had been "rodded out." It caused no damage to the sewer line. The inside diameter of the City sewer line is 8 inches, while the fire extinguisher is 13 inches long, and has a diameter of 4 inches at the bottom and 5 inches on top, with a handle and hose.

Parties hotly dispute the significance of finding the fire extinguisher, that is, whether it was actually determined that vandalism was the reason for the placement of the fire extinguisher into the sewer pipe, and whether the fire extinguisher was the cause of the blockage. Plaintiffs'

position, based on deposition and affidavit testimony, is that the City's conclusion following the investigation was that the fire extinguisher most likely entered the sewer system by the actions of vandals; and that the fire extinguisher blocked grease and paper from going through the pipe, causing a blockage. Defendant insists that Mr. Ford and Mr. Garcia did not come to that conclusion at all, and that both individuals merely ventured a "guess" as to how the fire extinguisher got into the sewer pipe. Defendant further contends that the fire extinguisher did not cause the blockage, but rather it was caused by an accumulation of grease and paper.

The City of Las Cruces Wastewater Collection Supervisor, Mr. Glenn Ford, investigated the sewage overflow at the 2065 O'Donnell address, and determined that in his opinion, "the placing of the fire extinguisher in the sewer system was the cause of the blockage leading to this incident." Ford Aff., Doc. 62, Ex. 2, ¶ 19. Although the City initially agreed to pay for the remediation costs of the sewer backup, on August 12, 2008, the City of Las Cruces declined to cover the damage. As a result of its investigation, the City had concluded that the blockage was caused by vandalism. The letter from the City stated:

> The City has determined that the flooding to your home at 2065 O'Donnell Drive occurred due to the fact that someone tossed a fire extinguisher and a piece of pipe into a manhole. These items drifted down the sewer line until they reached the pipes which serve the O'Donnell Drive house. When this occurred, the items caused the sewer system to become blocked and back up into the house. Thus far, it does not appear that any employee of the City of Las Cruces was responsible for placing these items in the sewer system. **I therefore assume that it is likely the work of vandals.** I mention this because the City of Las Cruces will only reimburse you for damages which it is responsible for causing. The acts of a vandal are, of course, beyond the City's control. I inform you of this so that you may take this into consideration in your renovation of the home.

Ex. "27" to Abrams Deposition, Ex. "12", (emphasis added). Parties dispute the evidence at this juncture as well. The day after she received the City's letter, on August 13, 2008, Mrs. Josie Frietze contacted Allstate to inform it of the City's position. She did not mail the letter to

Allstate. Mrs. Frietze claims that she read the letter verbatim to Allstate adjuster Tim Wray, including the City's conclusion that the fire extinguisher was placed in the sewer pipe by vandals. Doc. 62, Ex. 11 at 77. She also requested reconsideration of the claim and asked that the claim be processed. However, Allstate disputes that Mrs. Frietze mentioned vandalism, and Mr. Wray's allegedly contemporaneous notes of his conversation with Mrs. Frietze does not refer to vandalism:[3]

> recvd call from agent asking that I call insured, called insured and she (Josie Frietze) wants us to process claim bcs the city has declined to pay, revwd info and what we have availi shows back up from city sewer inc a fire extinguisher they found in sewer pipe, called back to advise denied and will not reconsider as not a covered loss but she asked I c/b after 1:30 pm, did reprint letter and sent again, she advised never got letter through system shows one has been sent [sic].

Doc. 62-6 at 11. Mr. Wray did not investigate further into why the City denied the Frietzes' claim. Instead, on August 15, 2008, Mr. Wray sent another denial letter to the Plaintiffs using identical language to the original denial letter. Doc. 62, Ex. 13.

On November 25, 2008, Mr. Abrams, the City Attorney at the time, spoke to an Allstate adjuster (which may have been Mr. Wray). Parties dispute the purpose of the call. Plaintiffs claim that Mr. Abrams called to request that Allstate further investigate its coverage determination. Defendant claims that Mr. Abrams was trying to find out if Allstate was going to cover the loss, according to Mr. Wray's notes:

> recvd call from Jared Abrams with the city trying to find out if this is covered . . . have no addl info indicating we need to investigate further, he conveyed the idea that they (city) want to file a claim with us for mitigation . . . [sic].

---

[3] In his deposition, Mr. Wray mentioned that the fire extinguisher's location in the sewer line, rather than on the site of Plaintiffs' property, also was a "key fact." Doc. 65-12 at 6. However, Allstate does not argue in any of the briefs that because the vandalism occurred off Plaintiffs' property, the loss was not covered. In addition, the language of the vandalism endorsement contains no limitation as a result of *where* the vandalism took place. Rather, the endorsement states simply that it does *not* cover vandalism; "if your dwelling is vacant or unoccupied for more than 90 consecutive days immediately prior to the vandalism." Doc. 62-1 at 13.

6

Doc. 62-6 at 11. Mr. Abrams did not recollect whether he described to the adjuster how the fire extinguisher got into the sewer, nor whether he used the word "vandalism." Doc. 65, Ex. K at 71. However, it is undisputed that he discussed with the adjuster the fact that the backup was caused by a fire extinguisher in the sewer pipe.

Defendant does not dispute the statement made by Allstate adjuster Michael Koepsell that Allstate has a duty to investigate the claim to determine the cause of loss before a claim is denied. Doc. 62, Ex. 5 at 21.

    C.    <u>Lawsuits Against City and Allstate</u>

On March 18, 2010, Plaintiffs sued the City for bad faith. The City used its vandalism theory to defend against the lawsuit. Plaintiffs subsequently settled this lawsuit in November 2011, receiving money. In May of 2012, after settling their lawsuit against the City and the Omni Apartments (the apartment complex where the City theorized that the fire extinguisher entered the sewer), Plaintiffs filed the instant lawsuit through a second attorney against Allstate in the Third Judicial District Court, State of New Mexico, alleging breach of contract, bad faith, and violation of insurance statutes. The original complaint alleged a sole theory for coverage under the Policy, based on Exclusion 15 in the Policy, providing coverage when "contamination" causes sudden and accidental escape of water or steam from plumbing in the house.[4]

Through a third set of attorneys (who are currently counsel of record), Plaintiffs filed an amended complaint (Doc. 58) which adds the vandalism theory. Defendants move for summary judgment on the "contamination" theory as well as the "vandalism" theory, but Plaintiffs have

---

[4] On January 3, 2012, prior to filing the instant lawsuit, Plaintiffs' attorney sent another demand letter to Allstate, asserting coverage under the Policy based on the "contamination" theory. Doc. 1-1 at 7-8. Allstate denied coverage a second time—the first time because of the Policy's water exclusion—and this time because Allstate determined that the "plumbing" at issue in the "contamination" provision must be located within Plaintiffs' dwelling. Doc. 1-1 at 25.

not responded to Defendant's arguments on this issue and have therefore waived their theory based on the "contamination" theory. As a result, Defendant is entitled to summary judgment on this theory of coverage.[5]

## II.    Legal Standard

Summary judgment is appropriate when the pleadings, deposition transcripts, affidavits and evidentiary material show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Welding v. Bios Corp.,* 353 F.3d 1214, 1217 (10th Cir. 2004). A party can obtain judgment as a matter of law in its favor "only if the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion." *Conoco Inc. v. ONEOK, Inc.,* 91 F.3d 1405, 1407 (10th Cir. 1996) (quotations omitted).

## DISCUSSION

This case rides on the question of whether, based on the undisputed facts (viewing each party's motion differently with regard to facts presented by the non-movant), Allstate breached its duty to investigate the Plaintiffs' claim for covering the damage caused by the sewer backup. The two main issues which are the subject of this motion are: (1) whether there was proof that the cause of the sewer backup was vandalism sufficient to trigger Allstate's duty to investigate Plaintiffs' claim further; and if so, (2) whether the lodging of the fire extinguisher in the sewer pipe was the predominant cause of the backup. Having set forth the undisputed facts in this

---

[5] Defendant claims that Plaintiffs should not be able to rely on the vandalism endorsement in the Policy as a basis for recovery in this lawsuit because in their earlier lawsuit against the City, they claimed that the City's reliance on the vandalism theory was in "bad faith" and because the original complaint against Allstate did not include vandalism. The Court agrees with Plaintiffs that the lawsuit against the City is immaterial to whether there is coverage under an insurance Policy executed between Plaintiffs and Allstate. Further, while the Court understands why Allstate would prefer to preclude Plaintiffs from relying on the vandalism endorsement, Plaintiffs should not be penalized for the fact that Plaintiffs' former attorneys did not think to include that endorsement as a basis for recovery in the original complaint. The Amended Complaint now governs this lawsuit, and the vandalism endorsement *is* now the theory on which Plaintiffs based their lawsuit.

case, the Court now turns to the merits on which there are purported issues of fact in order to resolve these questions.

Plaintiffs have set forth facts with the intention of showing that there is no dispute of fact suggesting that the sewer backup was not caused by the fire extinguisher being placed in the pipe due to vandalism, and that there is no dispute that this was not the "predominant cause" of the loss. Defendant's facts purport to show that vandalism has not been proved sufficiently to have alerted Allstate to conduct a further investigation after the first denial of Plaintiffs' claim, and to dispute that vandalism was a predominant cause of the loss.

**I.    Vandalism**

It is clear that if vandalism was not the cause of the placement of the fire extinguisher in the sewer pipe, there would be no coverage under the Policy. Under the Policy's language, vandalism occurred if the fire extinguisher was put in the pipe *either* willfully *or* maliciously.

Both parties appear to agree that the insured has the burden of showing a basis for coverage, and the insurer bears the burden of proving that an exclusion exists. *Battishill v. Farmers Alliance Ins. Co*. 139 N.M. 24, 26 (N.M. 2006) (after insured met burden of proof where it was undisputed that damages were caused by arson, the burden shifted to insured "to prove that the loss is not covered by evidence showing an exception, exclusion or other limitation applies").[6] The "disputes" on the issue of whether vandalism occurred are based on statements made by Glenn Ford, Director of the City's Utilities Department, and Dr. Jorge Garcia, the City's Utilities Engineer. Defendant contends that the testimony of these individuals is that there was no way to know how the fire extinguisher got into the City's sewer system; that

---

[6]  Parties claim to disagree about their respective burdens. *See* Doc. 62 at 21; Doc. 65 at 22. Plaintiffs claim that because the Policy was an "all risk" policy, Defendant has the burden of showing that an exclusion applies. Defendant contends that a plaintiff has the initial burden to prove coverage, the insurer then must prove that coverage is excluded, after which a plaintiff must prove exceptions exist which restore coverage. Both positions are internally consistent.

9

Mr. Ford was only venturing a "guess" as to how the fire extinguisher got into the City sewer system, and that he refused to testify that someone willfully or maliciously placed it into the sewer.

> Q. Would you agree that we really don't know how or why the fire extinguisher got into the sewer system?
> . . .
> A. Yes.
> Q. Would you agree it would only be a guess as to how it got in?
> A. Yes.
> . . .
> Q. You're not here today to tell us that someone willfully or maliciously put [the fire extinguisher] in the sewer system, are you?
> . . .
> A. No.
> Q. You don't have knowledge one way or the other that somebody did it willfully or maliciously?
> A. No.

Doc. 65-7 at 81:9-15 & 89:12-19.

However, Plaintiffs present testimony showing that both Mr. Ford believed that the fire extinguisher was inserted in the pipe by an individual:

> Q. So, when you say "was inserted into the sewer system," that is based upon your investigation and your 17 years of experience?
> A. Inserted—what I meant by "inserted" was placed into the sewer system somehow.
> Q. By an individual?
> A. Yes . . . Like what you stated earlier, it couldn't have walked in there by itself. Somebody had to have put it in there.
> . . .
> Q. Based upon your investigation, it was more likely than not it [sic] was inserted by somebody?
> . . .
> A. I would think so, yes.

Doc. 71-4 at 87-88:15-9; 90:9-13. Further, Plaintiffs offer testimony supporting the theory that the fire extinguisher placement in the sewer pipe was the work of vandals rather than an accident:

>  There is no reason why a City employee would use a fire extinguisher or PVC pipe in or near a sewer line or manhole. I therefore conclude that someone other than a City employee placed the objects in the manhole.[7] . . . In my opinion, it would be much easier for a vandal to place foreign objects in any manhole located in the Omni Apartments due to the absence of traffic.

Doc. 62-2 (Ford Aff., ¶¶ 17 & 42). In his deposition two years after his affidavit, Mr. Ford was asked how he came by his conclusion:

>  Q. You ruled out all the other causes and made a determination . . . that the fire extinguisher was inserted into the sewer system; is that your determination?
>  . . .
>  A. Yes, because I don't see how else it could have gotten into the sewer system without somebody, you know – with the manhole open or placing it there or they were working there and it got knocked in.

Doc. 65-7 at 90:5-8. Defendant reads into this last statement a significance that is not borne out by the testimony read in its context. Mr. Ford's comment about the fire extinguisher getting "knocked in" by a City worker was clearly not meant to be his considered opinion about how the fire extinguisher came to be placed in the sewer pipe. Rather, it was part of Mr. Ford's process of deduction in coming to his conclusion that the fire extinguisher had been placed there by an individual, by eliminating other theoretical possibilities.

Plaintiff also submits the testimony of Dr. Garcia, who reviewed the results of the investigation, and opined that vandalism was the cause of the loss:

>  Q. Do you agree with [Mr. Ford's statement] that "Due to the fact that manhole 107028 is a locking manhole, there is nothing more the City was required to do to insure that this manhole would be safe from vandals placing foreign objects in it." Do you agree with that statement?
>  A. Yes.
>  Q. And do you agree with his conclusion that it's more likely than not that a vandal placed foreign objects in the sewer, i.e., the fire extinguisher?
>  . . .
>  A. Yes.

---

[7] A portion of PVC pipe was also found lodged in the same area as the fire extinguisher. Doc. 62 at 8, n.7.

Doc. 62-9 at 16:3-22; *see also* 26-27.  Allstate objects to Dr. Garcia's testimony because he conducted no independent investigation and did not independent research of his own.  However, Plaintiffs note that Allstate stipulated to Dr. Garcia as a qualified expert who may review the investigation.  Allstate has not formally challenged the substance or reliability of Dr. Garcia's testimony; has not conducted any investigation of its own, and offers no evidence to rebut this opinion.  Thus, the Court considers Dr. Garcia's testimony to be undisputed.

Defendant mischaracterizes some of the testimony given by Mr. Ford.  For example, he did not "refuse to testify" that someone had willfully or maliciously put the fire extinguisher into the sewer.  *See* doc. 65, Fact No. 19.  Rather, Mr. Ford testified that he had no knowledge "one way or the other that somebody did it willfully or maliciously" in the sewer.  Mr. Ford did not witness the placement of the fire extinguisher in the sewer, which would naturally prevent him from saying that he knew for a fact that vandalism had occurred.  Defendant also describes the testimony of Mr. Ford and Dr. Garcia as "non-sustainable and an untestable guess which they were not willing to make."  Doc. 70 at 6; Doc. 65 at 22.  However, the substance of this testimony is not inconsistent with their opinions being a "guess," inasmuch as there were no eyewitnesses who saw anyone actually inserting the fire extinguisher, and both individuals concluded that vandalism was the cause after eliminating other possibilities.

Plaintiffs present evidence consistent with a finding that the placement of the fire extinguisher was "willful," which constitutes the definition of "vandalism" under the Policy.[8]  Defendant presents no evidence disputing the opinions that the fire extinguisher was inserted into the sewer pipe by an individual, and that it did not get into the sewer system on its own.   On the other hand, Plaintiffs present overwhelming evidence to dispute Defendant's position that there

---

[8]  Willful conduct is the intentional doing of an act with knowledge that harm may result. NMRA 13-1827.

12

is a "complete failure of proof of alleged vandalism." Doc. 70 at 10.   In the end, Defendant offers no factual evidence to rebut the overwhelming evidence offered by Plaintiffs that the fire extinguisher was inserted in the sewer pipe by an individual and was probably the result of vandalism.  In other words, Plaintiffs offer evidence to preclude summary judgment in favor of Defendant, but Defendant offers no evidence which would preclude summary judgment in favor of Plaintiffs on this issue.

## II.   Duty to Investigate

An insurer has a duty to its insured "to make a reasonably prompt investigation of all relevant facts" of the insured's claim.  *Jessen v. Nat'l Excess Ins. Co.*, 108 N.M. 625, 629, 776 P.2d 1244, 1248 (1989), overruled on other grounds by *Paiz v. State Farm. Fire and Cas. Co.*, 118 N.M. 203, 880 P.2d 300, 307 (N.M. 1994).   An insurer must act reasonably in conducting a timely and fair investigation or evaluation of a claim.  *Sloan v. State Farm Mut. Auto. Ins. Co.*, 360 F.3d 1220, 1224 (10th Cir. 2004).

The question here is whether either party is entitled to summary judgment on the issue of whether Allstate reasonably investigated Plaintiffs' claim, as well as whether there was coverage under the Policy.  For Plaintiffs to prevail on summary judgment, they must meet their burden of showing coverage sufficiently to alert Allstate to conduct an investigation into their claim. Allstate prevails if it can show no dispute of fact that their conduct was reasonable.

The Policy contained a vandalism endorsement which provided for coverage if vandalism could be shown to be the cause of the loss.  The threshold part of the inquiry is whether Allstate was required to investigate in the absence of any specific information that "vandalism" had occurred.   If so, then the Court must deny summary judgment to both parties because neither has presented factual disputes as to whether Mrs. Frietze mentioned the City's vandalism theory to

13

Mr. Wray when she notified Allstate of the City's denial of the claim, and whether Allstate was advised in any way about vandalism occurring.

However, the Court finds that, based on the undisputed facts as to both parties, one party here *is* entitled to partial summary judgment, regardless of whether Allstate was ever advised specifically of the "vandalism" theory.   It is true that Plaintiffs' lawyers did not communicate the "vandalism theory" to Allstate until the complaint was amended in this case.  However, it is undisputed that Allstate, through its adjuster Mr. Wray, *was* informed that the City had found a fire extinguisher inserted into the sewer pipe, and that this was the cause of the blockage and backup.  Defendant insists that unless Allstate was specifically advised about a "vandalism" theory, it could turn a blind eye to what part the fire extinguisher might have had in the sewer backup.  The Court rejects this notion. An insurer has the duty to act reasonably in conducting a timely and fair investigation or evaluation of a claim.  No reasonable juror would find that Allstate had insufficient information to alert the need for further investigation.  Fire extinguishers are not normally found in sewer pipes, and a backup that occurred in a sewer pipe in which a fire extinguisher had been lodged should have prompted Allstate to conduct further inquiry into whether that fire extinguisher was responsible for the sewer backup.   Instead, Allstate insisted it had received no additional information from the time it had written off the claim as coming under the water exclusion in Exclusion 2, and continued to deny Plaintiffs' request to investigate.

Thus, the Court finds that Plaintiffs have met their burden of showing coverage, that is, that the sewer backup was caused by an event which required an investigation, and which came within the vandalism endorsement in the Policy.

**III.    Predominant Cause of Loss**

The remaining dispute centers on Exclusion 24 which states that Allstate does not cover loss to covered property where there are two or more causes of loss to the covered property, and the predominant cause of loss is excluded under the Policy. Because "predominant" is not defined in the Policy, both parties provide their own gloss on its meaning.

Plaintiff equates "predominant cause" with "efficient proximate cause" which in turn means the initial event which sets a chain of events into motion, or the "moving cause." New Mexico courts have not considered or adopted the doctrine of "efficient proximate cause" in the context of first-party, all-risk insurance. *Winters v. Charter Oak Fire Ins. Co*., 4 F.Supp.2d 1288, 1294 (D.N.M.,1998). However, most courts that have addressed the issue appear to use the two terms interchangeably.[9]

Allstate disagrees with Plaintiffs' reliance on efficient proximate cause to define predominant cause, and instead offers that predominant cause means "most important" cause rather than "moving" or "triggering cause." However, Defendant's argument carries no weight because the only legal support Allstate can muster is from two California cases which, in an attempt to define "efficient proximate cause" (and not "predominant cause"), narrowed the former to exclude the initiating cause of the loss. *See Pieper v. Commercial Underwriters Ins. Co.,* 69 Cal. Rptr. 2d 551, 557 (Cal.App. 4th 1997) ("We use the term 'efficient proximate cause'

---

[9] *See Terminal Freezers Inc. v. U.S. Fire Ins.*, 345 Fed.Appx. 305, 306, 2009 WL 2905980, 1 (9th Cir. 2009) (The efficient proximate cause, in turn, is the "predominant cause which *[sic]* sets into motion the chain of events producing the loss."); *Pecos Valley Cotton Oil, Inc. v. Fireman's Fund Ins Co*., 780 F.2d 892, 894 (10th Cir. 1986) ("efficient and predominating cause" defined as a close causal relationship between the use of the vehicle and the accident; mere coincidence of the two events is insufficient); *Winters v. Charter Oak Fire Ins. Co*., 4 F.Supp.2d 1288, 1294 (D.N.M.,1998) (efficient proximate cause holds that if the initial effect, the 'efficient proximate cause,' is a covered peril, then there is coverage under the policy regardless whether subsequent events within the chain, which may be causes-in-fact of the loss, are excluded by the policy); *Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co.*, 472 F.3d 33, 48 (2d Cir. 2006) (cited cases omitted) ( in a case where a covered and excluded peril combine to cause a covered loss, courts typically apply the efficient proximate cause rule—meaning, that the insured is entitled to coverage only if the covered peril is the "predominant cause of the loss or damage. . . The efficient proximate cause of a loss is the cause that originally sets other events in motion."); *Fourth St. Place v. Travelers Indem. Co*., 270 P.3d 1235 (Nev., 2011) (where covered and noncovered perils contribute to a loss, the peril that set in motion the chain of events leading to the loss, or the predominating cause, is deemed the efficient proximate cause or legal cause of loss).

(meaning predominating cause) . . . because we believe the phrase 'moving cause' can be misconstrued to deny coverage erroneously, particularly when it is understood literally to mean the 'triggering' cause"). The reasoning in these California decisions was to avoid situations where an insured could argue that a remote event caused the loss and thus came within coverage *See Garvey v. State Farm Fire & Cas. Co.,* 48 Cal. 3d 395, 403, 770 P.2d 704, 708 (1989) (the insured can point to some arguably covered contributing factor [which would] give rise to coverage [and which in turn] would mean that an 'all-risk' policy would become an 'all-loss' policy").

In this case, there is no need to resolve which definition governs. First, the weight of available case law on this issue is in favor of Plaintiffs. Second, applying either parties' definition of predominant cause ("triggering event" or "most important cause"), the end result is the same.

Defendant argues that even if the fire extinguisher was put in the sewer pipe by vandals, the fire extinguisher was not capable of qualifying as a predominant cause. Rather, Allstate argues that the "number one" cause of the backup was the grease and paper accumulation, basing this conclusion on the fact that after the paper and grease debris was cleared, the sewer pipe flowed freely for two days before the fire extinguisher was removed. Doc. 65 at 15-16; Doc. 70 at 18. Defendant points to Mr. Ford's testimony that "grease, heavy paper and rags are the "most common causes of clogs or backups in the city sewer." Doc. 65-7 at 9. Allstate thus concludes that the fire extinguisher could not have caused the backup, and since Exclusion 2 in the Policy excludes coverage for water "or any other substance that backs up through sewers or drains," coverage does not apply under the "predominant cause" provision in Exclusion 24.

Defendant's "undisputed facts" on the issue of predominant cause defy common sense. The fact that the sewer pipe flowed freely once it was unclogged by removing the grease and paper debris is immaterial to whether the fire extinguisher caused the backup in the first place. Grease and paper debris are by their nature, items that are normally found in sewers—thus, the reason for their being common causes of sewer line backups. On the other hand, a fire extinguisher, which is not an item one expects to ever find in a sewer pipe, would certainly qualify as a "most important" cause, if not a "moving cause." No reasonable juror could discount the fact that a 4" by 13" object stuck inside a pipe with a diameter of 8" would severely compromise the integrity of the pipe, as well as the flow of usual debris which normally flows, and is expected to flow, in a sewer pipe. Without the presence of the fire extinguisher in the pipe, grease and paper may have eventually accumulated over time to cause a backup, but one can speculate all day about how long that would have taken. It is nonsensical to think that the fire extinguisher could not have caused the blockage simply because the pipe ran freely for two days after it was unclogged with the debris around the fire extinguisher.[10] It is undisputed that the fire extinguisher was stuck inside the sewer line. Its presence most certainly severely compromised the flow of debris normally running through sewer pipes, and thus, most certainly was the predominant cause of the sewer backup.

Allstate also relies on the total inside area measurements of both the fire extinguisher and the sewer line (supposedly a 1:4 ration) to come up with the calculation that it was mathematically impossible for the fire extinguisher to be the cause of the blockage. Defendant

---

[10] Neither party provides a definitive answer as to how long it takes for such debris to clog a sewer line, probably because no definitive answer is possible. Plaintiffs offer Mr. Ford's testimony that, even though the line had been unclogged, it would have "taken a while for paper and debris to build upon the fire extinguisher and grease and whatever to plug it completely off." Ex. 18 at 38:11-16. Mr. Ford also stated that, ". . . due to the size of the fire extinguisher, inserting the fire extinguisher into the sewer system would cause a blockage to occur very quickly." Doc. 62-2 at 10.

17

contends that ". . . as a matter of physical fact, the [fire extinguisher] accounts for only about 25% of the total inside area of the sewer line." Doc. 70 at 17. These mathematical calculations completely ignore the many other variables that must be considered in order to determine how a sewer pipe system acts under a particular set of conditions. The total inside area of the fire extinguisher may well be only ¼ of the total inside areas of the sewer pipe, but even in the almost impossible circumstance that the fire extinguisher was neatly lodged inside the pipe exactly longitudinally, no reasonable juror could find that the fire extinguisher was not the culprit behind causing a blockage in the flow normally expected to flow in the sewer pipe.

Thus, under either party's definition of "predominant cause" ("moving cause" or "most important cause"), the fire extinguisher (or the act of vandalism which caused the lodging of the fire extinguisher in the sewer pipe) is, as a matter of law, the "predominant cause" of the backup. As mentioned previously, there is no risk that either the role of the fire extinguisher in the backup was such a remote factor that there would be a need to decide which party's definition applies. Further, the Court has already found that the weight of the available case law supports Plaintiffs' position. *See Battishill v. Farmers Alliance Ins. Co.*, 139 N.M. 24, 26 (N.M., 2006) ("an insurance policy is not rendered ambiguous merely because a term is not defined; rather, the term must be interpreted in its usual, ordinary, and popular sense"). The Court has already found that there are no material facts suggesting that the fire extinguisher was placed in the sewer pipe other than by vandalism. Because the Court has also found that the fire extinguisher was, as a matter of law, the predominant cause of the backup, Exclusion 24 does not apply to prevent coverage, and thus, coverage exists under the Policy.[11]

---

[11] It appears that Allstate's denial of the claim may have been based on another position that is equally lacking in common sense. At one point in his deposition, Mr. Wray stated that from his point of view, the "key fact" underlying the denial of Plaintiffs' claim was the fact that the backup was "off the site of the insured's property."

## CONCLUSION

Plaintiffs are suing Allstate for Breach of Contract, Violation of the Unfair Insurance Practices Act, and Insurance Bad Faith (Counts I, II and III, respectively).   Plaintiffs seek partial summary judgment on Count I of the complaint (Breach of Contract) only and thus, the Court's foregoing discussion and ultimate findings regard that claim only.

In sum, the Court finds and concludes the following:

- that Plaintiffs have waived their theory of recovery in the Amended Complaint based on the "contamination theory" under Section 15(e) of the Policy, as set forth in the Amended Complaint in ¶ 25;

- that Defendant offers no factual evidence to rebut the overwhelming evidence offered by Plaintiffs that the fire extinguisher was inserted into the sewer pipe by an individual and was the result of vandalism; and concomitantly, Plaintiffs offer substantial evidence to dispute Defendant's facts presented to show the fire extinguisher was not a result of vandalism;

- that, as a result of the undisputed facts, Plaintiffs have met their burden of showing coverage under the Policy under the vandalism provision, which triggered Allstate's duty to investigate, and that Allstate failed to reasonably investigate;

- that the predominant cause of the backup was the fire extinguisher and the vandalism, and as a result, Exclusion 24 does not operate to exclude coverage under the Policy; therefore, there is coverage for the loss resulting from the sewer backup under the Policy;

- that Plaintiffs' motion for summary judgment on Defendant's duty to indemnify is granted with regard to Plaintiffs' breach of contract claim in Count I of the Amended Complaint, with the Court finding specifically that: (1) Allstate breached its duty to conduct a timely and fair investigation of Plaintiffs' claim; Allstate breached its duty to indemnify Plaintiff under the Landlord Package Policy in light of the Vandalism Endorsement; and (3) as a result of Allstate's breach of its duties to investigate and to

---

Doc. 65-12 at 6 (Ex. L at 107:3-8).  Defense counsel's subsequent questions to Mr. Wray exposed the fallacy of this position:
Q. (Mr. Dow): If I take a gun and I stand off the property and I shoot the gun into the house, that is vandalism, right? . . . It causes damage inside the house but I am off the property, right? . . .
A. Correct.
Q. That could be a covered loss under a vandalism clause, right? . . .
A. Yes.
Q. If I stand outside in the street and I take a fire extinguisher and I throw it through the window and it causes damage inside the house, the fire extinguisher caused the damage, right?  It is an issue, isn't it? . . .

indemnify, Allstate is liable for damages to be determined by jury trial with regard to that claim.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment **(Doc. 65)** is hereby DENIED;

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment on Defendant's Duty to Indemnify **(Doc. 62)** is hereby GRANTED on Count I for Breach of Contract for reasons described in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE